# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JEFFREY NEIL YOUNG, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONETOUCHPOINT, INC.<br><br>Defendant. | Case No. 2:22-cv-1029<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Neil Young ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant, OneTouchPoint, Inc. ("OTP" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE CASE

1.     This is a class action brough on behalf of all persons in the United States whose personally identifying information ("PII") or personal health information ("PHI") was compromised in the OneTouchPoint, Inc. data breach ("Data Breach") disclosed by Defendant on July 27, 2022 (the "Class").

2.     It is also brough on behalf of a subclass of individuals residing in Maine whose PII and/or PHI was compromised in the Data Breach (the "Maine Subclass" or "Subclass" , together with the Class, the "Class").

3.     OTP is a provider of mailing and printing services for healthcare providers, offering print, marketing execution and supply chain management services to organizations in the

healthcare sector.  It provides healthcare organizations with the ability to manage their brands across departments, clinic locations and hospital affiliates, create and execute prescriptive marketing campaigns, and enable on and off- line marking efforts.

4.      In doing so, OTP received the PII and PHI of the customers and patients of its customer healthcare providers ("Customer Healthcare Providers").

5.      Given that it is provided with such sensitive and private information, OTP emphasizes to its clients and publicly that it ensures that the Customer Healthcare Provider's messaging and assets with which it is engaged are compliant with regulations.  Its advertising specifically states that its marketing efforts are "[d]esigned around compliance", and that its efforts will enable its healthcare clients to comply "with state and federal regulations" while it executes "HIPAA compliant patient communications".  Specifically, it touts that it "adhere[s] to the strictest HIPAA standards" and "ensure[s] that the handling of protected health information (PHI) is secure."

6.      It further states that it is a Business Associate under HIPAA, and that OTP "will sign a Business Associate Agreement ("BAA")" with its customers to become "joint custodians of protected health information (PHI)." [1]

7.      In direct conflict with its advertising and representations, on July 27, 2022, OTP announced that it had been the victim of a Data Breach. Specifically, OTP stated on its website that on April 28, 2022, it discovered encrypted files on certain computer systems. After commencing an investigation, and with the assistance of its forensic specialists, it determined that there was unauthorized access to certain of its servers beginning on April 27, 2022. [2]

---

[1] https://1touchpoint.com/solutions/healthcare (last viewed on August 31, 2022).
[2] https://1touchpoint.com/notice-of-data-event (last viewed on August 31, 2022).

8.      On June 1, 2022, OTP learned that it would be unable to determine what specific files the unauthorized actor viewed within the OTP network, and provided a summary of its investigation to its customers beginning on June 3, 2022.  OTP later determined that the impacted systems contained certain information related to individuals provided by its customers.  It subsequently worked with its customers to determine what personal information related to individuals was stored on the OTP network, to whom that information related, and offered to mail letters to potentially impacted individuals.

9.      In its Notice of Breach on its website, OTP warns affected individuals "to remain vigilant against incidents of identity theft and fraud, to review account statements and explanation of benefit forms", to monitor "free credit reports for suspicious activity" and to "detect errors".  Notably, it did not offer any recompense or even credit monitoring to those affected by the Data Breach.

10.     OTP's original notice of data breach filed with the U.S. Department of Health and Human Services and the Office of the Maine Attorney General disclosed that the Data Breach had affected about 1,000,000 persons[3].  However, more recent disclosures indicate that the breach may have affected up to 2,700,000 from over 35 healthcare providers.[4]

11.     As a business associates of healthcare providers that handle sensitive, personally identifying information ("PII") or protected health information ("PHI"), OTP owed a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will

---

[3] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last viewed Aug. 31, 2022).
[4]     https://www.beckershospitalreview.com/cybersecurity/vendor-ransomware-attack-affects-2-7m-healthcare-organizations.html#:~:text=A%20ransomware%20attack%20involving%20printing,healthcare%20systems%20and%20health%20plans.

result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

12.     The harm resulting from a data breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures as OTP acknowledged.

13.     Despite that OTP became aware of the Data Breach by April 28, 2022,[5] it failed to notify Plaintiff and the putative Class Members within sixty (60) days as required by law. To date, OTP has never notified Plaintiff.  Rather, as further discussed below, Plaintiff received a Notice of Data Breach from OTP's client, Martin's Point Health Care  ("Martin Point"), indicating that it was recently contacted by Matrix Medical Network ("Matrix"), a client of OTP, about the Data Breach.

14.     Plaintiff on behalf of himself and the Class and Subclass as defined herein, brings claims for negligence, negligence *per se*, breach of fiduciary duty, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

15.     Based on the public statements of OTP to date, as well as statements by its customer-healthcare providers ("Customer-Healthcare Providers"), a wide variety of PII and PHI

---

[5] OneTouchPoint, *Notice of Data Security Event*, https://1touchpoint.com/notice-of-data-event, (last visited August 8, 2022).

was implicated in the breach, including full names, addresses, healthcare member IDs, and information provided during health assessments (*i.e.*, diagnoses, medications, dates of birth, sexes, physical demographics information, family histories, social histories, allergies, vitals, and immunizations). [6] According to the July 28, 2022 data breach letter (the "Data Breach Letter") received by Plaintiff, the Data Breach further involved preventive and chronic care recommendations.

16.     As a direct and proximate result of OTP's inadequate data security, and its breach of its duty to handle PII and PHI with reasonable care, Plaintiff's and Class Members' PII and PHI has been accessed by hackers and exposed to an untold number of unauthorized individuals.

17.     Plaintiff and Class Members are now at a significantly increased risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, which risk may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

18.     To recover from OTP for these harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring OTP to: 1) disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of PII and PHI possessed by OTP; and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

---

[6] *Id.; see also* Jonathan Greig*, At Least 34 Healthcare Orgs Affected by Alleged Ransomware Attack on OneTouchPoint*, The Record (Aug. 1, 2022), https://therecord.media/at-least-34healthcare-orgs-affected-by-alleged-ransomware-attack-on-onetouchpoint/.

## PARTIES

19.     Plaintiff Jeffrey Neil Young is an adult who at all relevant times has been a citizen and resident of the Maine.

20.     Defendant OneTouch Point, Inc. is a corporation organized under the laws of Wisconsin, with its principal place of business located at 1225 Walnut Ridge Dr., Hartland, Wisconsin 53029-8300.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

22.     This Court has personal jurisdiction over OTP because OTP has its principal place of business in Wisconsin.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), because this is the District in which OTP resides, and is where a substantial part of the acts, omissions, and events giving rise to Plaintiff's claims occurred.

## FACTUAL BACKGROUND

**A. OneTouchPoint and the Services Provided.**

24.     OTP provides online and offline traditional marketing and communication strategies to Customer-Healthcare Providers to help them find and engage patients.

25.     OTP provides these services to Customer-Healthcare Providers nationwide.

26.     Upon information and belief, while administering its marketing and communication services, OTP receives, maintains, and handles PII and PHI from its Customer-Healthcare

Providers, which includes, *inter alia*, individuals' names, birthdates, addresses, healthcare member IDs, service dates, service descriptions, diagnosis codes, health evaluation dates, and healthcare recommendations.

27.     As indicated in the Data Breach Letter that Plaintiff received, OTP also had access to health and wellness reports prepared by healthcare organizations that it was charged with disseminating to their patients.

28.     Upon information and belief, because OTP receives, maintains, and handles PII and PHI from its Customer-Healthcare Providers, OTP qualifies as a business associate within the meaning of 45 CFR § 160.103(3) and has therefore entered into Business Associate Agreements with its Customer-Healthcare Providers, becoming a custodian of PHI.

29.     As a business associate of its Customer-Healthcare Providers, OTP is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1302d, *et seq*.

30.     Plaintiff and Class Members directly or indirectly entrusted OTP with their sensitive and confidential PII and PHI and therefore reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential consistent with its duties as a Business Associate and its representations on it website, among other things.

31.     As a custodian of Plaintiff's and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

**B. OTP Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to Victims.**

32.     At all relevant times, OTP knew it was storing sensitive PII and PHI and that, as a result, OTP's systems would be attractive for cybercriminals.

33. OTP also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

34. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, Blackbaud, and many others. Third party vendors who are repositories of PII and PHI have in particular been the target of cybercriminals and ransomware attack.

35. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data as well as the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

36. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[8]

---

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited Aug. 8, 2022).

[8] *Data Breach Report: 2021 Year End*, Risk Based Security (February 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last accessed Aug. 8, 2022).

37.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[9]

38.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[10]

39.     "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the industry a growing target."[11]

40.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves individuals, whose PII and PHI Defendant possesses, especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

41.     As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even

---

[9] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Aug. 8, 2022).

[10] SwivelSecure, *The healthcare industry is at risk*, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited on Aug. 8, 2022).

[11] *Id.*

seen $60 or $70."[12]  A complete identity theft kit that includes health insurance credentials may be

worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[13]

      42.    According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[14]

---

[12] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-itthey-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Aug. 8, 2022).

[13] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com /gx/en/consultingservices/information-security-survey/assets/the-global-state-of-information-security-survey2015.pdf (last visited Aug. 8, 2022).

[14] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-themand-what-to-do-after-one/ (last visited Aug. 8, 2022).

43. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[15]

44. Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

45. OTP certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

**C. OTP Breached its Duty to Protect the PII and PHI in its Custody.**

46. On July 27, 2022, Defendant released a "Notice of Data Privacy Event" ("Notice") that announced on or around April 28, 2022, OTP was alerted to unauthorized access to OTP servers and that it discovered encrypted files on certain computer systems.[16]

---

[15] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 8, 2022).

[16] OneTouchPoint, *Notice of Data Security Event*, https://1touchpoint.com/notice-of-data-event, (last visited August 31, 2022).

47.     OTP determined that the information impacted included: "an individual's name, [healthcare] member ID, and information that may have [been] provided during a health assessment."[15]

48.     According to OTP, it investigated the Data Breach and found "no evidence of misuse of any information related to this incident" but also encouraged "individual to remain vigilant against incidents of identity theft and fraud, to review account statements and explanation of benefits forms, and monitor[] free credit reports for suspicious activity, and detect errors."[17] Thus, based on the amount of sensitive information OTP possesses, it would be naïve to believe the cybercriminals did not purposefully steal sensitive information with a specific intent to use it or sell it to others who will.

49.     However, OTP's Customer-Healthcare Providers have issued their own data breach notifications, informing individuals that their "ID numbers, diagnoses, medications, addresses, dates of birth, sexes, physician demographics information, family histories, social histories, allergies, vitals, immunizations, and more" were exposed as a result of the Data Breach.[18]

50.     The unauthorized persons gained access to the PII and PHI of approximately 2.7 million patients of OTP's Customer-Healthcare Providers.[19]

---

[17] *Id.*

[15] *Id.*

[18] Jonathan Greig, *At Least 34 Healthcare Orgs Affected by Alleged Ransomware Attack on OneTouchPoint*, The Record (Aug. 1, 2022), https://therecord.media/at-least-34-healthcare-orgsaffected-by-alleged-ransomware-attack-on-onetouchpoint/.

[19] *Data Breach Notifications*, OFF. ME. ATT'Y GEN, https://apps.web.maine.gov /online/aeviewer/ME/40/0a2e4b99-8e95-4860-b05f-62c239a13993.shtml, (last visited Aug. 8, 2022).

51.     While the Data Breach occurred in April, Defendant alerted the public and affected individuals at the end of July, three full months after the breach. In those months OTP left the public in the dark and it failed to inform individuals of the danger posed by the ongoing breach. Even now, OTP's disclosures have been vague and evasive, leaving Plaintiff and class members with incomplete information regarding the true nature and extent of the Data Breach.

52.     The Data Breach occurred as a direct result of OTP's failure to implement and follow basic security procedures in order to protect its patients' PII and PHI.

53.     OTP says it "take[s] "the confidentiality, privacy, and security of information in its care seriously" yet sent alerts to individuals affected of the Data Breach after it was too late for individuals to safeguard their information, and/or failed to provide any notice, and provides no assistance to individuals affected by the Data Breach in the event of their identity being stolen.[20]

## D.  Facts Pertinent to Plaintiff

54.     Plaintiff received the Data Breach Letter dated July 28, 2022 from Martin's Point, indicating that it had recently been contacted by Matrix, a vendor who did business with OTP.

55.     The Data Breach Letter indicated that an OTP server containing the information of certain Martin's Point Generations Advantage Point plan members, such as Plaintiff, was on an OTP server that was encrypted by ransomware, and that the ransomware destroyed the information on the server.

56.     Martin's Point indicated that information involved in the incident included home wealth and wellness visit reports prepared by Matrix and sent to OTP for mailing to treating

---

[20] OneTouchPoint, *Notice of Data Security Event*, https://1touchpoint.com/notice-of-data-event, (last visited Aug. 8, 2022).

physicians, and that those letters contained home health visit information including diagnoses, medications, and preventive and chronic care recommendations.

57.    It further stated that in response to the Data Breach, Martin's Point had instructed Matrix to terminate its relationship with OTP with respect to providing services to Martin's Point members.  It further states that Martin's Point is reviewing its own policies and procedures and coordinating with Matrix to identify additional measures to prevent such an incident in the future.

58.    Martin's Point further offered its members 12 months of credit monitoring with IDX.

**E.  Plaintiff and Class Members Suffered Damages.**

59.    For the reasons mentioned above, OTP's conduct, which allowed the Data Breach to occur, caused the Plaintiff and members of the Class significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

60.    Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiff and Class members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of OTP's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been diminished by its exposure in the Data Breach. Since the Data Breach occurred,

Plaintiff has noticed an increase in what appear to be phishing attempts directed to his business email account, among other things.

61.     As a result of OTP's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PHI.

62.     Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

## CLASS ALLEGATIONS

63.     Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose PII and/or PHI was compromised in the Data Breach.

64.     Plaintiff also brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following Subclass:

> All residents of the State of Maine whose PII and/or PHI was compromised in the Data Breach.

65.     Excluded from the Class and Subclass is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

66.     This proposed Class and Subclass definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

67. The requirements of Rule 23(a)(1) are satisfied. The Class and Subclass described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court. The exact size of the class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach, but based on public information, the Class includes approximately 2.7 million individuals.

68. The requirements of Rule 23(a)(2) are satisfied. There is a well-defined community of interest, and there are common questions of fact and law affecting members of the Class and Subclass. The questions of fact and law common to the Class and Subclass predominate over questions that may affect individual members and include the following:

a. Whether Defendant had a duty to protect the PII and PHI of Plaintiff and Class and Subclass Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class and Subclass Members' PII and PHI, and breached its duties thereby;

c. Whether Plaintiff and Class and SubclassMembers are entitled to damages as a result of Defendant's wrongful conduct; and

d. Whether Plaintiff and Class and Subclass Members are entitled to restitution as a result of Defendant's wrongful conduct.

69. The requirements of Rule 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of the members of the Class and Subclass. The claims of the Plaintiff and members of the Class and Subclass are based on the same legal theories and arise from the same failure by Defendant to safeguard PII and PHI.

70. OTP was the custodian of Plaintiff's and Class and Subclass Members' PII and PHI, when their PII and PHI was obtained by an unauthorized third party.

71.     The requirements of Rule 23(a)(4) are satisfied. Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the members of the Class and Subclass . Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and Subclass and has no interests antagonistic to the members of the Class and Subclass. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class and Subclass members are substantially identical as explained above.

72.     The requirements of Rule 23(b)(3) are satisfied here because a class action is the superior method of litigation for these issues, and common issues will predominate. While the aggregate damages that may be awarded to the members of the Class and Subclass are likely to be substantial, the damages suffered by the individual members of the Class and Subclass are relatively small. As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class and Subclass to individually seek redress for the wrongs done to them. Certifying the case as a Class and Subclass will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and Subclass and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class and Subclass . Defendant's uniform conduct is generally applicable to the Class and Subclass as a whole, making relief appropriate with respect to each Class and Subclass member.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(ON BEHALF OF PLAINTIFF AND THE CLASS AND SUBCLASS)**

73.     Plaintiff restates and realleges all proceeding factual allegations above as if fully set forth herein.

74. OTP owed a duty under common law to Plaintiff and Class and Subclass Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

75. OTP's duty to use reasonable care arose from several sources, including but not limited to those described below.

76. OTP had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class and Subclass Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that is routinely targeted by criminals for unauthorized access, OTP was obligated to act with reasonable care to protect against these foreseeable threats.

77. OTP's duty also arose from OTP's position as a business associate. OTP holds itself out as a trusted business associate of healthcare providers, and thereby assumes a duty to reasonably protect the information it obtains from its Customer-Healthcare Providers. Indeed, OTP, which receives, maintains, and handles PII and PHI from its Customer-Healthcare Providers, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class and Subclass Members as a result of the Data Breach.

78. OTP breached the duties owed to Plaintiff and Class and Subclass Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, OTP breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by

failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

79. But for OTP's wrongful and negligent breach of its duties owed to Plaintiff and Class and Subclass Members, their PII and PHI would not have been compromised.

80. As a direct and proximate result of OTP's negligence, Plaintiff and Class and Subclass Members have suffered injuries, including:

    a.    Theft of their PII and/or PHI;

    b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.    Costs associated with purchasing credit monitoring and identity theft protection services;

    d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

    g.    Damages to and diminution in value of their PII and PHI entrusted, directly

or indirectly, to OTP with the mutual understanding that OTP would safeguard Plaintiff's and Class and Subclass Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in OTP's possession and is subject to further breaches so long as OTP fails to undertake appropriate and adequate measures to protect Plaintiff's and Class and Subclass Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class and Subclass members.

81. As a direct and proximate result of OTP's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## NEGLIGENCE PER SE
## (ON BEHALF OF PLAINTIFF AND THE CLASS)

82. Plaintiff restates and realleges all proceeding factual allegations above as if fully set forth herein.

83. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as OTP or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of OTP's duty.

84. OTP violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. OTP's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving patient PII and PHI obtained from its Customer-Healthcare Providers.

85. OTP's violation of Section 5 of the FTC Act constitutes negligence *per se*.

86.     Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

87.     OTP is an entity covered under the HIPAA, which sets minimum federal standards for privacy and security of PHI.

88.     Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, OTP had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class members' electronic PHI.

89.     Specifically, HIPAA required OTP to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et. seq*.

90.     HIPAA also requires OTP to provide Plaintiff and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 CFR §§ 164.400-414.

91.     OTP violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; and by failing to provide Plaintiff and Class members with notification of the Data Breach within 60 days after its discovery.

92.     Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients of OTP's Customer-Healthcare Providers.

93.     OTP's violation of HIPAA constitutes negligence *per se*.

94.     The harm that has occurred as a result of OTP's conduct is the type of harm that the FTC Act and HIPAA was intended to guard against.

95.     As a direct and proximate result of OTP's negligence, Plaintiff's and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY / BREACH OF DUTY OF CONFIDENTIALITY
(ON BEHALF OF PLAINTIFF AND THE CLASS AND SUBCLASS)**

96.     Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

97.     Plaintiff and Class and Subclass Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by OTP and that was ultimately accessed or compromised in the Data Breach.

98.     As a business associate of its Customer-Healthcare Providers and recipient of patients' PII and PHI, OTP has a fiduciary relationship to its customers' patients, like Plaintiff and the Class and Subclass Members, and it owes them, at a minimum, an implied duty of confidence and confidentiality.

99.     Because of that fiduciary and special relationship and the nature of the sensitive data OTP received, when OTP was provided with and stored private and valuable PHI related to Plaintiff and the Class and Subclass, Plaintiff and the Class and Subclass were entitled to expect their information would remain confidential while in OTP's possession, even in the absence of direct privity between them.

100.    OTP owed a fiduciary duty and a duty of confidence under common law to Plaintiff and Class and Subclass Members to exercise the utmost care in obtaining, retaining, securing,

safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

101. OTP breached the duties owed to Plaintiff and Class and Subclass Members. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, OTP breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

102. But for OTP's wrongful breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

103. As a direct and proximate result of OTP's breaches of its fiduciary duty and duty of confidentiality, Plaintiff and Class and Subclass Members have suffered injuries, including:

      a.      Theft of their PII and/or PHI;

      b.      Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

      c.      Costs associated with purchasing credit monitoring and identity theft

protection services;

d.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.     The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.     Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to OTP with the mutual understanding that OTP would safeguard Plaintiff's and Class and Subclass Members' data against theft and not allow access and misuse of their data by others;

h.     Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in OTP's possession and is subject to further breaches so long as OTP fails to undertake appropriate and adequate measures to protect Plaintiff's and Class and Subclass Members' data; and

i.     Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

104.     As a direct and proximate result of OTP's breach of its fiduciary duty, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (ON BEHALF OF PLAINTIFF AND THE CLASS AND SUBCLASS)

105.     Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

106.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

107.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class and Subclass Members' PII and PHI and whether OTP is currently maintaining data security measures adequate to protect Plaintiff and Class and Subclass Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that OTP's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and PHI and remains at imminent risk that further compromises of his PII and/or PHI will occur in the future.

108.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    OTP owes a legal duty to secure patient PII and PHI obtained from its Customer-Healthcare Providers and to timely notify such patients of a data breach under the common law, Section 5 of the FTC Act and HIPAA.

      b.    OTP breached and continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII and PHI.

109.    This Court also should issue corresponding prospective injunctive relief requiring OTP to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

110.    If an injunction is not issued, Plaintiff and Class and Subclass Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at OTP. The risk of another such breach is real, immediate, and substantial. If another breach at OTP occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

111.     The hardship to Plaintiff and Class and Subclass Members if an injunction does not issue exceeds the hardship to OTP if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to OTP of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and OTP has a pre-existing legal obligation to employ such measures.

112.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at OTP, thus eliminating the additional injuries that would result to Plaintiff, Class and Subclass Members, and consumers whose confidential information would be further compromised.

**FIFTH CAUSE OF ACTION**
**MAINE UNFAIR TRADE PRACTICES ACT,**
**5 Me. Rev. Stat. §§ 205, 213, *et seq.***
**(On Behalf of Plaintiff and the Maine Sub-Class)**

113.     Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

114.     OTP is a "person" as defined by 5 Me. Stat. § 206(2).

115.     OTP's conduct as alleged herein related was in the course of "trade and commerce" as defined by 5 Me. Stat. § 206(3).

116.     Plaintiff and Maine Subclass members purchased goods and/or services for personal, family, and/or household purposes.

117.     OTP engaged in unfair and deceptive trade acts and practices in the conduct of trade or commerce, in violation of 5 Me. Rev. Stat. §207, including:

> a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Maine Subclass members' Private Information, which was a direct and proximate cause of the Data Breach;

> b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and

privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maine Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Maine Subclass members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maine Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505;

f.  Failing to timely and adequately notify Plaintiff, and Maine Subclass members of the Data Breach;

g.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Maine Subclass members' Private Information; and

h.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maine Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505.

118.  OTP's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of OTP's data security and ability to protect the confidentiality of consumers' Private Information.

119.  OTP's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and the Maine Subclass members, that their Private Information was not exposed and misled Plaintiff and the Maine Subclass members into believing they did not need to take actions to secure their identities.

120.    Had OTP disclosed to Plaintiff and Class members that its data systems were not secure and, thus, vulnerable to attack, OTP would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, OTP was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff, the Class, and the Maine Subclass. OTP accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls secret from the public. Accordingly, because OTP held itself out as maintaining a secure platform for Private Information data, Plaintiff, the Class, and the Maine Subclass members acted reasonably in relying on OTP's misrepresentations and omissions, the truth of which they could not have discovered.

121.    As a direct and proximate result of OTP's unfair and deceptive acts and conduct, Plaintiff and Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial and other accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

122.    Plaintiff and the Maine Subclass members seek non-monetary relief allowed by law, including damages or restitution, injunctive and other equitable relief, and attorneys' fees and costs.

123.    As of the filing of this complaint Plaintiff intends to amend this complaint to seek monetary damages pursuant to the pre-suit notice requirement but does not need to send notice at this time.

**MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**10 Me. Rev. Stat. §§ 1212, *et seq*.**

**(On Behalf of Plaintiff and the Maine Sub-Class)**

124.     Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

125.     OTP is a "person" as defined by 10 Me. Rev. Stat. § 1211(5).

126.     OTP advertised, offered, or sold goods or services in Maine and engaged in trade or commerce directly or indirectly affecting the people of Maine.

127.     OTP engaged in deceptive trade practices in the conduct of its business, in violation of 10 Me. Rev. Stat. §1212, including:

    a.    Representing that goods or services have characteristics that they do not have;

    b.    Representing that goods or services are of a particular standard, quality, or grade if they are of another;

    c.    Advertising goods or services with intent not to sell them as advertised; and

    d.    Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

128.     OTP's deceptive trade practices include:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Maine Subclass members' Private Information, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maine Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505, which was a direct and proximate cause of the Data Breach;

    d.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Maine Subclass members' Private Information, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maine Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505;

f.    Failing to timely and adequately notify Plaintiff, and Maine Subclass members of the Data Breach;

g.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Maine Subclass members' Private Information; and

h.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maine Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505.

129.    OTP's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of OTP's data security and ability to protect the confidentiality of consumers' Private Information.

130.    OTP's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and the Maine Subclass members, that their Private Information was not exposed and misled Plaintiff and the Maine Subclass members into believing they did not need to take actions to secure their identities.

131.    OTP intended to mislead Plaintiff and Maine Subclass members and induce them to rely on its misrepresentations and omissions.

132.    Had OTP disclosed to Plaintiff and Maine Subclass members that its data systems were not secure and, thus, vulnerable to attack, OTP would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, OTP was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff, and the Maine Subclass. OTP accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls secret from the public. Accordingly, because OTP held itself out as maintaining a secure

platform for Private Information data, Plaintiff and the Maine Subclass members acted reasonably in relying on OTP's misrepresentations and omissions, the truth of which they could not have discovered.

133. As a direct and proximate result of OTP's deceptive trade practices, Plaintiff and Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

134. Maine Subclass members are likely to be damaged by OTP's ongoing deceptive trade practices.

135. Plaintiff and the Maine Subclass members seek all monetary and non-monetary relief allowed by law, including damages or restitution, injunctive or other equitable relief, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for relief as follows:

a. For an order certifying the Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class and Subclass Counsel to represent the Class;

b. For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

c. For damages in an amount to be determined by the trier of fact;

d. For an order of restitution and all other forms of equitable monetary relief;

e. Declaratory and injunctive relief as described herein;

f. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.    Awarding pre- and post-judgment interest on any amounts awarded; and

h.    Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated:  September 7, 2022

Respectfully Submitted,

*/s/ Gary F. Lynch*
Gary F. Lynch
Nicholas A. Colella
Hannah Barnett
**LYNCH CARPENTER, LLP**
1133 Penn Ave., Fl. 5
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com nickc@lcllp.com
hannah@lcllp.com

Melissa R. Emert
Gary S. Graifman
**KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.**
135 Chestnut Ridge Road
Suite 200
Montvale, NJ 07645
Tel: (201) 391-7000
Fax: (201) 307-1086
memert@kgglaw.com
ggraifman@kgglaw.com

Lynda Grant
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442
lgrant@grantfirm.com